**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | §<br>§<br>§ | **COMPLAINT FOR**<br>**FORFEITURE *IN REM*** |
| **v.** | §<br>§ | |
| **APPROXIMATELY 1,766,583 USDT** | §<br>§ | *CIVIL ACTION NO.* |
| **Defendant, *in rem.*** | §<br>§<br>§ | **26-cv-2540** |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 1,766,583 USDT, hereinafter referred to as "Defendant Property", and alleges as follows:

**STATEMENT OF THE CASE**

1. Criminals believed to be located abroad, their associates, and conspirators together stole funds from multiple U.S. victims. The funds were then laundered through a series of virtual currency addresses, and sometimes virtual currency exchanges, to evade detection and hide the origin of the funds. The Federal Bureau of Investigation (FBI), investigated, traced, and seized the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

**JURISDICTION AND VENUE**

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5.      Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

**NATURE OF THE ACTION AND STATUTORY BASIS FOR FORFEITURE**

6.      The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(h), 2, and 3.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such

offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.    18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.    18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.    18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.    18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of

unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.    18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## PROPERTY INFORMATION

15.    The Defendant Property is $1,766,583 USDT, which is the equivalent to $1,766,583 in U.S. dollars (USD).  The Defendant Property is associated with the following virtual currency addresses, collectively, the "SUBJECT VIRTUAL CURRENCY ADDRESSES":

0x3118b3755BC3a4a038663012e1FB0b0314F6CdfF ("Subject Address 1");

0x60f18b1f4522267e5e4EF19A8cf98B652e8022e1 ("Subject Address 2");

0x5aFAF8B6081EB1fE9beec6DCB01663Fa1Afb1A91 ("Subject Address 3");

0x5510BCfBDb65d512AD415B7E35D670F9b1E49376 ("Subject Address 4").

16.    The SUBJECT VIRTUAL CURRENCY ADDRESSES collectively held $1,766,583 USDT.  The virtual currency associated with the SUBJECT VIRTUAL CURRENCY ADDRESSES is hereinafter referred to as the "Defendant Property."

17.    The United States has yet to take custody and control over the Defendant Property.

## STATEMENT OF FACTS

### Background on Cryptocurrency

18.    **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

19.    **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual

currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

20.    **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

21.    **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

22.    **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

23.    **Virtual Currency Wallet:** A virtual currency wallet (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send

6

and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

24. **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

25. **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

26. **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

27.    **Tether:** Tether International S.A. de C.V. ("Tether Ltd") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

28.    **Ether:** Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

## Background on Cryptocurrency Investment Fraud

29.    Cryptocurrency investment fraud ("CIF") schemes, commonly referred to as "pig butchering," generally involve scammers tricking consumer victims to make purported investments in virtual currency on fraudulent or non-existent investment platforms, typically alleged to be managed by a third-party, and fictitious returns are provided to encourage additional investments. The scammers typically initiate contact through text messages or social media platforms and eventually form a relationship with victims to gain victims' trust. Those relationships may be perceived by the victims as romantic, professional, or friendship-based. The scammers often create profiles using fictitious names, locations, images, and personas, allowing the scammers to cultivate perceived personal relationships with prospective victims.

30.    Once the scammer develops a rapport with the victim, they will often introduce the victim to cryptocurrency, and to fraudulent investment platforms through which the victim can invest. The scammers generally promise a lucrative return of investment if the victim invests, as the scammers allegedly have, in the fake third-party platform, and scammers manipulate the fraudulent investment platform to show an increase in the victim's account balance. The scammers typically also provide falsified transaction records or photos that depict the scammers contributing their own funds to the victim's initial investment. Often enticed by the falsified returns, victims continue to invest, until they try to retrieve their gains, only to find that they are unable to retrieve them. The scammers then demand that victims make additional payments to the platform for their

investments to be released and/or withdrawn. Examples include, victims being required to pay an additional percentage to the fraudulent platform to purportedly guarantee the funds, prepay taxes on the balance, or pay a fee/fine due to suspicious money laundering activities. Eventually, scammers complete their theft once they believe they are unlikely to extract any more funds from the victim, and usually cease contact with the victim, never providing the return of their "invested" funds.

31.    CIF schemes are largely run out of scam compounds, predominantly based in Southeast Asia, however, they have recently expanded to other continents.[2] These schemes are often facilitated by multiple individuals with different roles and responsibilities, including those who set up and operate the fraudulent investment platforms, those who are in contact with victims, and those who support laundering of proceeds. The criminal syndicates involved in these schemes commingle, consolidate, and conceal their illicit proceeds using money laundering techniques on the blockchain to frustrate law enforcement detection and intervention.

32.    In 2024, more than 41,000 complainants reported being victimized by CIF schemes to the FBI's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[3]

**Overarching CIF Investigation Involving the SUBJECT VIRTUAL CURRENCY ADDRESSES**

33.    This investigation began when a victim, named M.G. (Victim-1) reported to law enforcement that they[4] were the victim of a CIF scam, where they lost over $343,800 in

---

[2] *See* U.S. Treasury Dep't, Financial Crimes Enforcement Network, *FinCEN Alert* on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering," FIN-2023-Alert005, 1-2 (Sept. 8, 2023), https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.
[3] *See* Fed. Bureau of Investigation, *Internet Crime Report 2024* at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.
[4] Throughout this complaint, "they" and "their" are used in reference to individual victims to avoid sharing any unnecessary identifying information about them.

cryptocurrency to an address provided by an unidentified suspect on a fraudulent investment website.

34.    By investigating this fraudulent investment platform, the FBI was able to identify and trace other cryptocurrency transactions that were connected to other victims, who were also tricked into depositing cryptocurrency into addresses provided by the fraudulent investment platforms, similar to the one Victim-1 utilized to send their money. The funds from other victims were then traced into the SUBJECT VIRTUAL CURRENCY ADDRESSES.

35.    In sum, based on the victims' reports, investigation of the fraudulent investment platforms they used, and the tracing of those victims' funds to the SUBJECT VIRTUAL CURRENCY ADDRESSES, the funds contained in the SUBJECT VIRTUAL CURRENCY ADDRESSES comprise proceeds of CIF wire fraud schemes, further described below, and are commingled with funds that are involved in the concealment of those proceeds as part of a money laundering scheme. Therefore, the funds in the SUBJECT VIRTUAL CURRENCY ADDRESSES are subject to forfeiture as further set forth in this complaint.

### Background Regarding the Fraudulent MicMarkets Investment Platform

36.    According to Victim 1, in or around June 2024 they met someone on a dating app named Ambrose Andersson, who claimed to be a dual Swedish and American citizen, who knew five languages and was also learning Chinese. Although they met on a dating app, Andersson asked Victim 1 to communicate with him using WhatsApp.

37.    Andersson told Victim 1 that he works as a cryptocurrency trader, and that he owns his own analyst group in Cincinnati, Ohio. Andersson successfully convinced Victim 1 to open an account at MicMarket FX, a purported cryptocurrency investment platform with which Victim 1 believed they could invest their funds. Victim 1 received trading information from Andersson and his supposed trading group.

38.     After Victim 1 started trading, on or about July 29, 2024, it appeared Victim 1 began making a profit, which they left in their account. Until in or around September 2024, Victim 1 continued sending funds to what they believed to be their trading account at MicMarket FX. However, after Victim 1 sent a transaction in or around September 2024, their MicMarket FX account froze. After requesting to unfreeze their account, Victim 1 was told that they needed to send additional funds, which they did; the account was never unfrozen.

39.     Victim 1 reported sending a total of $281,300 to MicMarket FX for investing, and an additional $62,500 to Andersson in an attempt to unfreeze Victim 1's MicMarket FX account, losing a total of $343,800.

40.     Victim 1's description of MicMarket FX matches the tactics and processes used by those who are perpetrating CIF. There have been at least sixteen identified instances of people being defrauded by the MicMarket FX domain. Funds from these victims have been traced to four different addresses, the SUBJECT VIRTUAL CURRENCY ADDRESSES. On or about November 2, 2024, law enforcement issued a freeze letter to Tether, requesting the funds be voluntarily frozen in anticipation of seizure; the freeze was confirmed by Tether on November 4, 2024.

41.     Figure 1 below depicts the approximate movement of some of the virtual currency related to all four of the SUBJECT VIRTUAL CURRENCY ADDRESSES and the Defendant Property:

*Figure 1*



**Tracing Victim Proceeds to the Defendant Property**

### Subject Address 1

42.    Subject Address 1 contained approximately 406,498 USDT at the time of the freeze, most of which it received between in or around September 2024 and November 2024. About 72 percent of those assets were primarily transferred to Subject Address 1 by Subject Address 3 (discussed further, below) and the rest of the assets were transferred from 0xcda0b839d1e3ac9dd305b53e8b2a436d7139e2cf ("0xcda0b8") to Subject Address 1.

43.    According to Victim 1, from July 2024 through September 2024, Victim 1 sent in total approximately $343,800 of funds. Of this amount, 1.15 bitcoin (worth about $75,000 at the time of transfer) was sent in or around September 2024 from Victim 1's VCE account to bc1qptde0eakqe0cu7huqj2lx7g8g59sz8ydua60jl (bc1qptde). Another victim, J.C. (Victim 2)

reported losing about $86,000 to a scam involving her account at "Mic," which Victim 2 was convinced to open after someone she met via online dating encouraged her to start investing. Victim 2's VCE records show that in or about September 2024, she sent about 0.6 bitcoin (worth about $33,000 at the time of transfer) to bc1qptde.

44.     Between on or about September 14, 2024, and September 27, 2024, about 1.74 bitcoin from Victims 1 and 2 were transferred from bc1qptde into bc1qdd0ycv2lsxklt35edc3m58wl2n6n3fa2ftyd29 (bc1qdd0y). Victim 1 also transferred about 2.85 bitcoin directly into bc1qdd0y.

45.     Between on or about August 26, 2024, and September 27, 2024, about 4.59 bitcoin from Victims 1 and 2 was then sent from bc1qdd0y across the THORchain bridge. The THORchain bridge was used to transfer bitcoin on the Bitcoin blockchain for USDT on the Ethereum blockchain. 4.59 bitcoin, traced from Victims 1 and 2, were converted into about 279,500 USDT and transferred into 0xcda0b8. At least three other victims reported sending ether directly to 0xcda0b8 related to the same fraudulent MicMarkets scam, but they were not part of the funds being traced herein. 0xcda0b8 also received about 84,600 USDT of victim funds from 0xe690087bf606660130f2895ebf81a7b1075771cd (0xE69008), which will be further explained in the section discussing Subject Address 2.

46.     Between on or about September 21, 2024, and September 30, 2024, about 153,800 USDT of funds from Victims 1–5 (Victims 3–5 are discussed in the Subject Address 2 section) were transferred from 0xcda0b8 to Subject Address 1. Subject Address 1 also received about 162,800 USDT from Subject Address 3, comprising funds from five additional confirmed MicMarkets victims (Victims 7–11). Each of these victims reported to law enforcement similar stories to those of Victims 1–5 and used the same fraudulent investment platform. In total,

approximately 316,696 USDT of victim funds, traceable to the ten victims referenced above, were traced into Subject Address 1, none of which were transferred out of Subject Address 1 prior to the address being frozen by law enforcement. As such, of the balance of Subject Address 1 at the time of the freeze, about 316,696 USDT (about 77%) is traceable to Victims 1–5 and Victims 7–11 of the MicMarkets scam.

*Subject Address 2*

47.    Subject Address 2 contained approximately 44,527 USDT at the time of the freeze. Although Subject Address 2 received about 9.9 million USDT of deposits from on or about September 2023 through September 2024, its balance dropped to about 0.64 USDT in about July 2024. After its balance dropped to 0.64 USDT, Subject Address 2 only received about 529,000 USDT in deposits from in or around July 2024 through September 2024, 15% of which came from 0xcda0b8, and 37% of which came from 0xe69008, both of which received funds traceable to victims of the MicMarkets scam.

48.    VCE records from Victims 1 and 2 show that between July and August of 2024, the victims collectively sent about 1.28 bitcoin to bc1q5f9nkhf222xe2swzfg9jr4a0rfe49vzk8yudsv (bc1q5f9n). In addition to Victims 1 and 2, Victims 3–5, respectively B.N., L.D., and L.V., each reported being defrauded by the MicMarkets scam. Records from VCE accounts in the name of Victim 3 and 4 show that in or around July, 2024, they sent about 1.59 bitcoin (worth about $98,000 at the time) and about 0.65 bitcoin (worth about $43,000 at the time) to bc1q5f9n. Victim 5 reported to the FBI that they sent about $23,000 worth of bitcoin to bc1q5f9n from July through August of 2024.

49.    Between on or about July 10, 2024, and August 21, 2024, about 3.90 bitcoin, from Victims 1 through 5, was sent from bc1q5f9n to the THORchain bridge, where it was swapped for about 241,782 USDT and deposited into 0xe69008.

50.    On or about July 31, 2024, about 18,484 USDT of victim funds were transferred from 0xe69008 into Subject Address 2.

51.    Based on the above, of the balance of Subject Address 2 at the time of the freeze, about 18,484 USDT (about 41%) is traceable to Victims 1–5 of the MicMarkets scam.

### Subject Address 3

52.    Subject Address 3 contained approximately 244,029 USDT of the Defendant Property at the time of the freeze, most of which was accrued in November 2024, after its balance dropped to as low as about 13,300 USDT. About 174,000 USDT of the subsequently received funds are traceable to victims of the MicMarkets scam.

53.    Proceeds from about 12 confirmed victims, including Victim 6–11 and six additional victims of the MicMarkets scam (Victims 12–17) were ultimately sent into Subject Address 3. Victims 12–17 reported similar stories to law enforcement regarding their use of the MicMarkets fraudulent platform. The funds were originally sent by victims in the form of the virtual currency ether, then swapped from ether into USDT, where the funds either remained in Subject Address 3 or were transferred elsewhere, including other SUBJECT VIRTUAL CURRENCY ADDRESSES. In total, about 372 ether (worth about $945,600 at the time of transfer) was sent from the 12 victims into Subject Address 3. The transfers were made from on or about August 27, 2024, through on or about November 4, 2024. Each of these 12 victims initially sent their ether to a unique unhosted address, after which it was transferred to Subject Address 3 after about 45 minutes.

54.     For example, according to B.J. (Victim 6), they met someone on a dating app who called themselves Leon Martin. Shortly after meeting on the dating app, Martin, who appeared to be in Minneapolis, Minnesota, asked Victim 6 to move their conversation to WhatsApp. To convince Victim 6 he was legitimate, Martin sent Victim 6 a photo of what appeared to be his passport. Eventually, Martin convinced Victim 6 to open two different VCE accounts, at Coinbase and Crypto.com. Before messaging Martin, Victim 6 was not interested in cryptocurrency. Martin gave Victim 6 calculations about gold futures, which Victim 6 used in conjunction with an app called MicMarkets to supposedly make investments using virtual currency. A screenshot of the MicMarkets app that Victim 6 sent to me is provided below as Figure 2:

*Figure 2*



55.    Victim 6 believed they would be able to receive funds back from MicMarkets, and they were indeed able to receive a little bit back at first. In CIF scams, the scammers often make inducement payments, or small payments or withdrawals back to the victims early on in the scam cycle, to convince victims it is safe to invest more money. After making a larger deposit of funds into the alleged investment platform, however, Victim 6 was unable to make any additional withdrawals. When Victim 6 did try to make a withdrawal, Victim 6 was told they had to prepay taxes.  Even after Martin offered to pay half of the taxes, Victim 6 realized they were being defrauded and stopped sending funds.

56.    Victim 6 made a large deposit on or about November 4, 2024, comprising about 65.5 ether (worth about $159,000 at the time of transfer). After being swapped from ether to USDT, the funds were sent to Subject Address 3. Victim 6's funds comprised over 60% of Subject Address 3's balance at the time of freeze.

57.    In addition to Victim 6, the funds in Subject Address 3 also include funds from confirmed MicMarkets Victims 7–11, whose funds are also traceable to Subject Address 1, and Victims 12-17.

58.    Based on the above, 187,371 USDT (about 76%) of the 244,029 USDT balance in Subject Address 3 at the time of the freeze is traceable to victims of the MicMarkets scam.

*Subject Address 4*

59.    On the date of the freeze, Subject Address 4 contained approximately 1,071,527 USDT. A majority of the frozen balance in Subject Address 4 consists of USDT that has been discussed above, which is traceable to MicMarkets victims. About 125,000 USDT traceable to MicMarkets Victims 1–5 were transferred from 0xE69008 to Subject Address 4; about 132,500

USDT traceable to MicMarkets Victims 1–5 were transferred from 0xcda0b8 to Subject Address 4; and about 565,900 USDT were transferred from Subject Address 3 to Subject Address 4, which comprise funds that are traceable to the 12 confirmed MicMarkets victims discussed in the Subject Address 3 section. About 181,000 USDT of victim funds were subsequently transferred from Subject Address 4 to other addresses which did not have a balance that could be frozen.

60.     Based on the above, the current balance of about 1,071,527 USDT in Subject Address 4 comprises about 642,203 USDT (about 59%) that is traceable to victims of the MicMarkets scam.

61.     Based on the above, the table below (Figure 3) shows the approximate proportion of funds deposited into the SUBJECT VIRTUAL CURRENCY ADDRESSES that are traceable to 17 confirmed victims. All values in the table below are in U.S. dollars, accounting for the USDT transferred, because one USDT is worth $1.

*Figure 3*

| Subject Address | Total Funds (USD Equivalent) | Confirmed Victim Funds (USD Equivalent) | Proportion of Victim Funds in the Subject Address |
|---|---|---|---|
| **Subject Address 1** | $406,498 | $316,696 | 77.9% |
| **Subject Address 2** | $44,527 | $18,485 | 41.5% |
| **Subject Address 3** | $244,030 | $187,371 | 76.8% |
| **Subject Address 4** | $1,071,528 | $642,203 | 59.9% |
| **Total:** | **$1,766,583** | **$1,164,755** | **65.9%** |

62.     In addition to the confirmed victim funds summarized above, there are additional victims who are suspected of also being victims of the MicMarkets investment scam and whose funds may be included in the aforementioned addresses associated with the scam; however, as of this date, law enforcement has not heard back from these suspected victims.

63.     The SUBJECT VIRTUAL CURRENCY ADDRESSES are part of the MicMarkets investment scam and are used to receive proceeds of the MicMarkets investment scam directly and indirectly through intermediary addresses used for laundering.

64.     The MicMarkets cryptocurrency investment scam, the scammers in contact with these victims have committed wire fraud, in violation of 18 U.S.C. § 1343, and that at least about 1,164,755 USDT in proceeds of this wire fraud scheme targeting identified victims are traceable to the SUBJECT VIRTUAL CURRENCY ADDRESSES.

65.     The above flow of funds is indicative of money laundering. At each stage above, various methods were used by criminals to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceedings. Those methods include:

a.     *The Use of Unattributable "0 Level" Deposit Addresses (bc1qptde and bc1q5f9n, Figure 1)*. 0 Level addresses are the initial deposit addresses in which victims deposit funds on the blockchain. These addresses are provided to victims by the criminals. Because of this, criminals usually provide unhosted wallets as 0 Level addresses to evade identification or potential interference. Such is the case here with bc1qptde and bc1q5f9n, among others. Additionally, these 0 Level addresses are oftentimes only shared with one victim to reduce the likelihood that their address is flagged to law enforcement.

b.     *High Velocity Flow of Funds (numerous addresses, Figure 1).* Once deposited into the 0 Level Address, it is common for the funds to flow quickly from address to address before reaching a consolidation wallet, where the funds might rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again towards a cash-out point where they can convert the pool of funds to fiat currency. The

19

victims' funds reflect this method on numerous occasions by being transferred into, and out of, an address within days.

c.    *Swapping for Stablecoins, Especially USDT (Figure 1)*. CIF scammers involved in laundering victims' funds regularly exchange or "swap" the non-stablecoin cryptocurrencies that victims send them for stablecoins, especially USDT. According to investigators, money launderers are particularly drawn to USDT because of its low transactions fees and stability compared to other more volatile cryptocurrencies. Additionally, USDT is compatible on several different blockchains, which makes it easier to move funds across blockchains to further obfuscate the nature, source, control, and/or ownership of criminal proceeds.

d.    *Use of Consolidation Addresses to Comingle Funds (Subject Address 3 and 0xcda0b8, Figure 1)*. Defined as the "layering" stage of money laundering, funds derived from multiple victims are routed to the same address, where they are comingled, consolidated, and transferred together. Criminals use consolidation wallets to obfuscate the source of funds and complicate tracing efforts by investigators. Subject Address 3 and 0xcda0b8 served as a consolidation addresses, in which confirmed victim funds and funds of unknown origins, were deposited, and then transferred to other addresses, including the remaining three SUBJECT VIRTUAL CURRENCY ADDRESSES.

66.    There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring BTC, ETH, or USDT, each individual virtual currency transfer costs money. For USDT on the Ethereum blockchain, that cost comes through the payment of transactions fees, or "gas" fees, required by the Ethereum blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible.

Furthermore, each transaction delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

67. Furthermore, to trace more than one victim's funds to the same addresses from multiple reported incidents of fraud committed within a short time-period, as is the case in this investigation, suggests that each address is being used to collect, conceal, and launder those funds. The presence of numerous victims of similar fraud is further evidence that each address involved—in this case, each of the SUBJECT VIRTUAL CURRENCY ADDRESSES—was used in the laundering of funds generated by CIF. Therefore, the Defendant Property in the SUBJECT VIRTUAL CURRENCY ADDRESSES is the proceeds of, and/or is being used to conceal the proceeds of, specified unlawful activity, to wit, wire fraud, and is also involved in money laundering.

## COUNT ONE–FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(C))

68. The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

69. Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO–FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(A))

70. The Defendant Property constitutes property involved in (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), and (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

21

71.    Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.


Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


*/s/ Rick Blaylock, Jr.*
RICK BLAYLOCK, JR.                          JEHIEL I. BAER
TX Bar No. 24103294                         WSBA No. 46951
Assistant United States Attorney            Assistant United States Attorney
United States Attorney's Office             United States Attorney's Office
District of Columbia                        Western District of Washington
601 D Street, N.W.                          700 Stewart Street, Suite 5220
Washington, D.C. 20001                      Seattle, Washington 98101
(202) 252-6765                              (206) 553-4169
rick.blaylock.jr@usdoj.gov                  Jehiel.baer@usdoj.gov

## VERIFICATION

I, Andrew Cropcho, a Special Agent with the United States Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 21st day of July 2026.

_____
Andrew Cropcho
Special Agent
United States Federal Bureau of Investigation